**CASS STUDENT ADVERTISING IN-
CORPORATED, Plaintiff,**

v.

**NATIONAL EDUCATIONAL ADVER-
TISING SERVICES, INC.,
Defendant.**

**No. 73 C 2779.**

United States District Court,
N. D. Illinois, E. D.

April 15, 1974.

Wildman, Harrold, Allen & Dixon, Chicago, Ill., for plaintiff.

Gardner, Carton, Douglas, Chilgren & Waud, Chicago, Ill., and Forsythe, Mc-Govern & Pearson, New York City, for defendant.

MEMORANDUM OPINION

DECKER, District Judge.

Plaintiff, CASS Student Advertising Incorporated ("CASS"), has brought a three-count complaint against National Educational Advertising Services, Inc. ("NEAS"), for violations of the Sherman Act. 15 U.S.C. § 1 et seq. Count I alleges that "NEAS unlawfully possesses monopoly power in the relevant market and has unlawfully and wilfully acquired and maintained that power with the intent to monopolize the relevant market and with the intent to exclude CASS or any other competitor from the market" in violation of section 2 of the Sherman Act. 15 U.S.C. § 2. In Count II, NEAS is charged with attempting to monopolize the relevant market, also in contravention of section 2. Count III alleges that the contractual arrangements between NEAS and hundreds of college

newspapers, by which NEAS has undertaken to act as exclusive national advertising representative for the papers, constitute agreements in restraint of trade in violation of section 1 of the Sherman Act. 15 U.S.C. § 1. Plaintiff seeks various forms of declaratory and injunctive relief, and treble damages. The complaint defines the relevant market as "the market for representing college newspapers throughout the United States in the placement of national advertising."

This action was filed on October 31, 1973, together with a motion for a preliminary injunction. Thereafter, the parties undertook extensive and intense discovery, culminating in a three-day hearing in December on the motion for preliminary injunction. At the conclusion of the hearing, and on the court's suggestion, both parties agreed that the evidence then before the court would be considered as evidence in the final hearing, and submitted the case on that evidence for a decision on the merits. See Rule 65(a)(2), F.R.Civ.P. After a careful review of the evidence and the law, the court is of the opinion that judgment should be rendered for the defendant. Plaintiff has failed to demonstrate by a preponderance of the evidence that the market alleged in the complaint constitutes a relevant market for purposes of the Sherman Act. This memorandum opinion will constitute the court's findings of fact and conclusions of law for this case pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

*I. Description of the Business of a Representative for Placement of National Advertising*

The plaintiff and the defendant are both engaged in the business of representing college newspapers for the placement of national advertising. So far as the evidence indicates, the parties are, in effect, the only serious contenders in this field. The operation of this business can best be viewed as comprised of two aspects.

At the first stage, the company seeking to establish itself in the business solicits college newspapers to receive authorization to represent them to national advertisers. Because of a lack of staff, financial and other resources with which to solicit national advertisers on their own, most college newspapers which run national advertisements accept the services of a representative.

Upon acceptance by a newspaper, the second aspect of the representative's operation comes into play—the representative becomes an advertising space salesman for the college papers. The representative periodically publishes a "ratebook" listing information concerning the college papers it represents and distributes this to national advertisers or their advertising agencies. This booklet contains figures on line rates and circulation of the papers, enrollment of the schools, order instructions, and other pertinent data. Through this booklet, the representative solicits national advertisers, either directly or through their agencies, in an attempt to sell them on the college newspaper medium, or, at least the papers it represents, as a viable mode of publicizing their products or services.

The representative handles all details of the placement of the advertisements in each paper, including submission of advertising copy, confirmation, and billing. Although his advertisement may appear in a number of college papers, the advertiser receives only one bill from the representative setting forth the total amount due to all the schools designated by the advertiser as recipients of his ads.[1]

---

1. A typical payment process for a $100 advertisement placed through an agency would be as follows: The ad is submitted by the advertiser or its agency to the representative which sends it to the college newspapers designated by the advertiser. Each newspaper runs the ad and returns "tear sheets" to the representative to confirm the printing, together with a bill. The representative checks the copy to verify that the ad was correct with regard to size, appearance, etc. The advertising agency is then billed $100,

Dealing with college newspaper representatives has a significant convenience value to national advertisers. The companies and their advertising agencies find it difficult or inefficient, in attempting to place ads in college newspapers throughout the country, to make separate arrangements with each school. Nor are the advertisers interested in being approached by each college publication. Businesses such as NEAS and CASS allow the advertisers to deal with a single, specialized company in placing their advertisements.

It is clear that, as the representative adds more and larger schools to his list, the wider the audience it may guarantee and the more attractive the representative will appear to the national advertiser.

## II. The Parties

### A. CASS

CASS is a Florida corporation licensed to do business in Illinois, and maintains its principal place of business in Chicago. It also has offices in Los Angeles and New York City. In January, 1969, Messrs. Alan Weisman and Steven Zeinfeld founded a partnership called College Advertising Sales and Service in which they were equal partners. At that time, the business was primarily involved with representing Chicago-area college and high school newspapers for the placement of local advertising. In April, 1970, the business was incorporated in Florida as CASS Advertising Inc. Messrs. Weisman and Zienfeld own 50% of the stock in the corporation. In October, 1973, the name of the company was changed to its present designation.

During 1970, CASS decided to broaden its business to include representation of college newspapers throughout the country for the placement of national advertising. The complaint alleges that these efforts have been largely unsuccessful due to the position and practices of NEAS in the market, and specifically charges that the exclusive agreements which defendant has entered into with hundreds of college newspapers have caused the vast majority of those publications to refuse to deal with CASS. Plaintiff claims that total annual billings for national advertising in college newspapers are approximately $3 million, of which CASS receives only $50,000.

### B. NEAS

The defendant is a New York corporation with its principal place of business in that state. It is licensed to do business in Illinois and maintains offices in Chicago, Los Angeles and San Francisco.

For approximately forty years, the predecessor to NEAS was the only business which represented college newspapers for the placement of national advertising. In March, 1966, Readers Digest Sales and Service, Inc., purchased the company and operated it as a division under the name National Educational Advertising Services. On December 1, 1970, the division was purchased from Readers Digest by the present owners,[2] who were all employees of Readers Digest responsible for the operation of the division. At the time of the purchase, the liabilities of NEAS exceeded its assets. Evidently, the purchase took the form of a transfer of the business assets from Readers Digest and assumption of a portion of the liabilities by the new owners; no cash changed hands.

Among the assets transferred were the rights to exclusive agreements which

and, in turn, bills its client $100. Of the $100 paid to its agency by the advertiser, the agency receives a commission of 15% plus 2% of the balance. Hence, the agency would retain $16.50 ($15 plus 2% of $85, or $1.70), and would remit the $83.30 balance to the representative. Presently, NEAS and CASS take a 25% commission of this amount, or $20.83. Thus, the newspaper receives $62.47.

2. The present owners are Messrs. Joseph E. Hanson, Jr., Henry P. Dain, Richard Boylhart, and John O'Keefe. Mr. Hanson, President of NEAS, testified extensively for the defendant.

the company had with approximately 900 college newspapers throughout the country, designating NEAS as the exclusive representative of the papers for the placement of national advertising. In addition, the company had a number of oral agreements with papers under which NEAS acted as a non-exclusive representative. At the time of the hearing in this case, NEAS had written or oral agreements with 1103 college newspapers. Of these, 893 or 894 were identical written contracts designating NEAS as exclusive representative;[3] 7 or 8 non-exclusive written agreements; and 202 or 203 non-exclusive oral understandings. The 1973–74 NEAS "Directory" claims that the company represents 1070 college newspapers.

The Director also claims that the enrollment at colleges which have newspapers represented by NEAS is 7,163,734 which "represents 84.3% of the current 8,500,000 college market," although other evidence indicates that the registration at the institutions is 8,177,761, thus giving advertisers access to 87% of the student population through NEAS.[4]

The parties agree that the 100 schools with the largest student enrollment represent about one-third of all college students. Virtually all of the college newspapers at those institutions have exclusive arrangements with NEAS.[5]

The business of NEAS consists almost entirely of representing college newspapers in the placement of national advertising. Although the defendant also represents high school newspapers for the placement of national advertising and has recently established a college ra-

dio division, the revenues generated by these ventures are insignificant.

### III. The Relevant Line of Commerce

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1, while section 2 declares it illegal for any person to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. Before it can be determined whether there has been a contract, combination, or conspiracy in restraint of trade, or monopolization or an attempt to monopolize, the court must define the relevant market, both in terms of product or services, and geography. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L. Ed.2d 778 (1966); Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed.2d 247 (1965); International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959); United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S. Ct. 994, 100 L.Ed. 1264 (1956); Bendix Corp. v. Balax, Inc., 471 F.2d 149 (7th Cir. 1972); American Aloe Corp. v. Aloe Creme Corp., 420 F.2d 1248 (7th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 reh. denied, 400 U.S. 856, 91 S.Ct. 24, 27 L.Ed.2d 95 (1970). Without such a delineation of the proper market, there is no reference by which to measure a company's ability to lessen competition, control prices, or exclude competitors. Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp.,

---

3. The exclusive provision relates only to other college newspaper representatives. The paper or publication is free to accept advertising directly from a national advertiser or an advertising agency for the national company.

4. Mr. Hanson claimed at trial that the most up-to-date figures from the U. S. Department of Health, Education and Welfare show a college enrollment of 9,400,000. There was no evidence, however, as to the

number of these students who attended schools with papers represented by NEAS.

5. Unless a national advertiser has a specific reason to reach smaller schools, it is more economical for the company to place advertisements in large college or university papers as the line rates do not vary directly with enrollment. Thus, the size of a school is a major consideration of national advertisers in deciding to place ads in college papers.

*supra* at 177. See United States v. General Dynamics Corp., 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

The burden on this issue is upon the plaintiff. It must establish by a preponderance of the evidence that the alleged market is cognizable under the Sherman Act. Both parties agree that the geographic market is nation-wide. The critical dispute concerns the service or product market. Thus, the question is whether the business of representing college newspapers for the placement of national advertising is a type of service that constitutes a relevant market such that domination thereof makes out a "part" of commerce within the meaning of the Sherman Act.

In determining the relevant market for Sherman Act purposes, the Supreme Court has cautioned that "no more definite rule can be declared than that commodities [or services] reasonably interchangeable by consumers for the same purpose make up that 'part of the trade or commerce', monopolization of which may be illegal." United States v. E. I. dePont de Nemours & Co., *supra* at 395. This "reasonable interchangeability" standard was reaffirmed in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S. Ct. 1502, 8 L.Ed.2d 510 (1962), where the Court also noted the possibility for the existence of "submarkets":

> "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes . . . The boundaries of such a

submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325 (footnotes and citation omitted).[6]

The court's objective is to arrive at a "sensible market analysis or market definition" which "delineate[s] markets which conform to areas of effective competition and to the realities of competitive practice." L. G. Balfour Co. v. F. T. C., 442 F.2d 1, 11 (7th Cir. 1971). See United States v. Grinnell Corp., *supra* at 572, 576.[7] The court must be wary of falling into the temptation of tailoring the market to the dimensions of the defendant's business. *Id.* at 590 (Fortas, J., dissenting). Thus, the market should include all services which, in light of the characteristics set forth in *Brown Shoe, supra*, are in realistic rivalry for all or part of the business of presenting national advertising to the college campus. This is an ad hoc determination, "essentially a question of fact." ABA, Antitrust Developments 1955–1968 25 (1968). See Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp., *supra* at 178. So, in this case, the court must not be reluctant to include within the relevant market a number of different media or publications, and their advertising representative services, if the record reveals that the combination reflects commercial realities. United States v. Grinnell Corp., *supra* at 572.

Both parties presented testimony that college students comprise a distinct market for goods and services. They repre-

---

6. Although *Brown Shoe* arose under section 7 of the Clayton Act, 15 U.S.C. § 18, the Supreme Court, *in dicta*, has equated the Clayton Act's "line" of commerce with the Sherman Act's "part" of commerce. United States v. Grinnell Corp., *supra* at 572–573. Furthermore, the Seventh Circuit has noted the propriety of applying section 7 submarket analysis to section 2 cases. See L. G.

Balfour Co. v. F.T.C., 442 F.2d 1, 11 (7th Cir. 1971).

7. As my colleague, Chief Judge Edwin Robson has recently stated, "the product market must be drawn broadly enough to include competition as it exists." United States v. General Dynamics Corp., 341 F.Supp. 534, 555 (N.D.Ill.1972), aff'd, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

sent about one-third of the 18–24 age group. They have substantially different interests, and, in many cases, live in different environments and have different life styles from their noncollegiate peers. Generally, the students have a broader and more critical range of tastes and will spend more than people their age who are not in school.

Nor is there dispute that college newspapers constitute a distinct communications medium. The evidence strongly suggests that a higher percentage of college students read their college newspapers than any other publication,[8] and NEAS claims that the school papers are "the most reliable and effective medium to use" to reach the college market.

But these facts do not necessitate the conclusion that college newspapers or, rather, their representation throughout the country in the placement of national advertising, comprise a relevant market for Sherman Act purposes. This case involves a single service—publicizing a national advertiser's product or service to the college market. And the evidence indicates that, in this effort, college newspapers are in direct competition with a number of other communication methods.

The attitude of national advertisers toward college newspapers vis-a-vis other advertising media was illustrated by the testimony of Mr. Philip Murtaugh, a long-time employee of a national advertising agency.[9] In recently exploring the opportunities for promoting a client's product to the college market, he testified that a broad range of media

was considered, including television, AM and FM radio, commercial newspapers, magazines such as *Playboy*, *Penthouse*, *Oui* and *Sports Illustrated*, the college editions of *Time* and *Newsweek* magazines, other college publications, and billboards. Thus, although the advertising industry considers college newspapers to be a separate avenue of communication, it also considers them to be in competition with other publications and other media. Other evidence, including testimony from Mr. Weisman, demonstrates that direct mail advertisements, posters located on campus, student directory ads, advertising samples distributed on campus, commercial magazines distributed predominantly on campus, and "Beetleboards"[10] are all modes of reaching the college market and are used by some national companies who also advertise in college newspapers. In fact, a document entitled "ADVANTAGES OF USING CASS," sent to national advertisers or their advertising agencies, states in part:

> "[CASS] can help compliment your newspaper advertising through our affiliations with college radio representatives, poster placement representatives, student directory advertising representatives, sampling representatives, and direct mail representatives."[11]

Significantly, even college newspapers feel that they are under competitive pressure from other sources. Rather than deeming themselves the exclusive medium by which national companies can reach the campus, the newspapers

---

8. There was evidence, however, that approximately the same percentage of college students read local commercial daily newspapers as read their college papers.

9. The attitudes of the national companies on this issue must be examined, for, as the Seventh Circuit has noted, "any test 'which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful.'" L. G. Balfour Co. v. F.T.C., *supra* at 11, quoting United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y. 1958). At this stage of the analysis, the

buyers are the national advertisers; they are purchasing the advertising space offered by the college papers.

10. A Beetleboard is a comparatively new method of advertising in which the entire body of a Volkswagen is painted with a promotion of a given product.

11. During cross-examination, Mr. Weisman admitted that the communication methods mentioned in that flyer are means of reaching college students, and that national advertisers can and do use these services.

consider themselves to be in competition with many of the aforementioned advertising modes.

Thus, it can reasonably be concluded that, from the viewpoint of the industries involved, the national advertisers and the school papers, plaintiff's alleged market is not a relevant market or submarket.

No evidence was presented to differentiate the parties' business from those enterprises which attempt to sell advertising space in other publications or media. On the contrary, testimony for the defense by an employee of a commercial newspaper representative established that the functions performed by advertising representatives for commercial daily newspapers are "interchangeable" with the operations of representatives for other media. And Mr. Hanson stated that he was "doing the same thing selling space in college newspapers as [he] was [when he was working] on the Ladies' Home Journal" as an advertising salesman. Thus, neither CASS nor NEAS can be deemed a "specialized vendor," Brown Shoe Co. v. United States, *supra*, performing peculiar functions.

Although, with the possible exception of commercial dailies, many more college students read their college papers than read any other publication or watch television, there is no reason to conclude that that percentage is not matched by students who read a combination of other publications. Approximately the same percentage of students listen to radio as read their college newspapers. National advertisers apparently attribute minimal import to the great readership of college papers on campus because approximately only 20 of the top 100 firms, in terms of dollars spent on advertising, include college papers in their advertising campaigns. College newspapers apparently do not suffice for any national advertiser as the sole means to reach the college market. Although as plaintiff asserts, college papers may be

the only *newspapers* whose circulation is limited to the campus community,[12] they are not the only *publications* so limited. And many college papers report news generated off-campus, such as current national and international events.

The fact that national advertisers' use of college newspapers may be price-inelastic, as testified to by plaintiff's expert, is not sufficient to overcome the foregoing multitude of very real competitive relationships.

Since "[t]he varying circumstances [and evidence] of each case determine the result," United States v. E. I. duPont de Nemours & Co., *supra* at 395, any apparently conflicting definition of relevant market found in the opinions of other courts is not conclusive or binding upon this court. The sole judicial obligation is to appraise the particular evidence presented and to give due regard to analogous cases.

To support its market definition, plaintiff relies upon Kansas City Star Co. v. United States, 240 F.2d 643 (8th Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). In that case, defendants were indicted under section 2 for attempting to monopolize and monopolization of interstate trade and commerce in the dissemination of news and advertising in newspapers and on radio and television stations in metropolitan Kansas City. The Kansas City Star Company published the two leading daily newspapers and owned a radio and television station. On appeal from conviction, the Company maintained that it was indirect and vigorous competition with other mass media in disseminating news and advertising. In particular, defendant claimed "that it received competition from radio and television stations, magazines, both monthly and weekly, newsreels, topical books, etc." 240 F.2d at 659.

After noting the "reasonable interchangeability" test of the *duPont* case, the court concluded that neither

12. A number of newspapers of the larger universities, such as the *Michigan State* *Journal*, are distributed regularly into the general community.

"radio stations [nor] television stations located outside the metropolitan area herein described, magazines, newsreels, topical books, specialty publications, etc., are 'market alternatives' or effective substitutes . . ." *Id.*

Nonetheless, the court affirmed the trial judge's instructions which allowed the jury to consider "the existence of a wide range of competing media to determine if The Star was in a monopolistic position." *Id.* at 660.[13]

"From these instructions, it is quite clear that the jurors could have considered as sizeable competitors those which the court thought were not, and that other media with a small field of circulation compared to that of The Star, were actually a bar to monopoly." *Id.*

Similar to the Government in *Kansas City Star,* plaintiff here was accorded the opportunity to demonstrate lack of real and effective competition between college newspapers and other communication methods with respect to national advertising. But, unlike the court in that case, this court, as factfinder, has concluded that plaintiff has not sufficiently carried its burden on this point.

A similar conclusion was reached by the court in Huron Valley Publishing Co. v. Booth Newspapers, Inc., 336 F. Supp. 659 (E.D.Mich.1972). There, plaintiff sought a preliminary injunction prohibiting Booth's imminent publication of a free weekly newspaper, arguing that such action, considered in light of defendant's entrenched position in the publishing industry in the area, would constitute an attempt to monopolize the advertising market. *Id.* at 660–661. The court denied the injunction, rejecting plaintiff's product market definition as follows:

"For the purpose of this decision, the court cannot agree with plaintiff's contention that the relevant market must be limited to newspaper advertising alone. All advertising performs the same function of introducing and maintaining public awareness of the retailers' product. While some forms of advertising may be preferable to others because of cost, effectiveness or other factors, it is impossible to assume that an advertiser is sensitive to price changes in the newspaper advertising market alone." *Id.* at 662.

## IV. Conclusion

In sum, the record indicates that the plaintiff and defendant are in very real rivalry with other publications and media and their representatives for all or part of the national advertising dollars directed toward the college market. Plaintiff has not made out a sufficiently persuasive case for fragmentizing this competition. Economic and commercial realities do not support the conclusion that the market for representing college newspapers for the placement of national advertising is a "separate, identifiable market," International Boxing Club v. United States, *supra* at 250, or submarket.

Thus, the court has determined that the relevant market must be defined to embrace all modes of competition used to present national advertising to college students. Since no evidence was offered to show defendant's possession of monopoly power in that market,[14] there is no basis upon which the court can reasonably conclude that defendant has violated the antitrust laws.

Accordingly, it is ordered that judgment be, and hereby is, entered for the defendant, and that the complaint be, and hereby is, dismissed.

13. The trial judge's instructions were characterized as "eminently fair" by the appellate court. 240 F.2d at 660.

14. On the contrary, the record indicates that national advertisers spend minimal amounts, both in absolute and relative terms, to publicize their products in college newspapers.