**CASS STUDENT ADVERTISING, INCORPORATED, Plaintiff-Appellant,**

v.

**NATIONAL EDUCATIONAL ADVERTISING SERVICE, INCORPORATED, Defendant-Appellee.**

No. 74–1518.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1975.

Decided May 23, 1975.
Rehearing and Rehearing En Banc Denied July 8, 1975.

---

Jerald P. Esrick, Chicago, Ill., for plaintiff-appellant.

John T. Cusack and George M. Covington, Chicago, Ill., for defendant-appellee.

Before CLARK, Associate Justice (Retired),* and CUMMINGS and TONE, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal is from the dismissal of a treble damage suit by Cass Student Advertising, Inc. ("Cass") against National Educational Advertising Services, Inc. ("NEAS") alleging violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

Count I of the complaint asserted that NEAS exercised monopoly power in the relevant market in violation of Section 2 of the Sherman Act. The relevant market was defined as "the market for representing college newspapers throughout the United States in the placement of national advertising."

Count II charged that NEAS attempted to monopolize that market, also in violation of Section 2 of the Sherman Act.

Count III asserted that NEAS' agreements with college newspapers designating it as their exclusive agent were contracts in restraint of trade in violation of Section 1 of the Sherman Act. Count III also alleged that NEAS conspired with many college newspapers to restrain trade in plaintiff's business and prevented it from competing with defendant in the previously defined market.

In each count, plaintiff sought a judgment that defendant violated the Sherman Act, injunctive relief, treble damages, costs and attorneys' fees.

In a memorandum opinion reported in 374 F.Supp. 796 (N.D.Ill.1974), the district court held that the relevant line of commerce was not "the market for representing college newspapers for the placement of national advertising" but embraced other publications and media and their representatives. Thus the court determined that the relevant market included "all modes of competition used to present national advertising to college students." Since Cass was said to have offered no evidence to show NEAS' possession of monopoly power in that market, the district court concluded that NEAS had not violated the antitrust laws. 374 F.Supp. at 803. We reverse because of our disagreement with respect to the relevant market.

The evidence submitted below is largely uncontroverted. We deem it unnecessary to set aside the district court's findings of fact under the "clearly erroneous" standard embodied in Rule 52(a) of the Federal Rules of Civil Procedure. However, in concluding that the relevant market included all modes of competition used to present national advertising to college students, with all deference, the district court misapplied the appropriate legal standards, thus compelling reversal. See United States v. Connecticut National Bank, 418 U.S. 656, 666, 94 S.Ct. 2788, 41 L.Ed.2d 1016; Mullis v. Arco Petroleum Corp., 502 F.2d 290, 296–297 (7th Cir. 1974); [1] Bendix Corp. v. Balax, Inc., 471

---

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

1. In *Mullis,* the trial judge failed to define any relevant market. On appeal, plaintiff's sugges-

F.2d 149, 161 (7th Cir. 1972), certiorari denied, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51; American Aloe Corp. v. Aloe Creme Laboratories, Inc., 420 F.2d 1248 (7th Cir. 1970), certiorari denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91.

In this area, the classic principles were adumbrated in United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, the so-called Cellophane case, and Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510. In the former, the Supreme Court laid down the "reasonable interchangeability" test for ascertaining a relevant market for commodities. In *Brown Shoe,* this test was refined by recognizing that submarkets may exist whose boundaries

> "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. at 1524.

In *Du Pont* and *Brown Shoe,* relatively expansive markets were found to be appropriate. However, subsequent Supreme Court cases have recognized the propriety of narrower markets depending on the facts of the individual case. Thus in United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778, defendants unsuccessfully wanted protective services other than those of the central station variety to be included in the market definition. In rejecting that position, the Court observed:

> "What defendants overlook is that the high degree of differentiation between central station protection and the other forms means that for many customers, only central station protection will do. Though some customers may be willing to accept higher insurance rates in favor of cheaper forms of protection, others will not be willing or able to risk serious interruption to their businesses, even though covered by insurance, and will thus be unwilling to consider anything but central station protection." 384 U.S. at 574, 86 S.Ct. at 1706.

Similarly, in International Boxing Club, Inc. v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270, the Court held that the relevant market was the promotion of championship boxing contests in contrast to all professional boxing events, despite the claimed physical identity of the products involved. One of the reasons supporting this conclusion was testimony of representatives of the various media that there was a special demand for the rights to broadcast, telecast and film championship contests as compared to non-championship contests. 358 U.S. at 252, 79 S.Ct. at 245.

The most recent Supreme Court consideration of a relevant market occurred in United States v. The Connecticut National Bank, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 978. There the district court had concluded that both savings and commercial banks were in the same product market for Clayton Act purposes. While acknowledging that savings banks and commercial banks in Connecticut are fierce competitors as to certain services, a unanimous Court concluded that the business of commercial banking was sufficiently distinct from other credit institutions to warrant separate treatment.[2] Commercial banking was held to be a distinct line of commerce even though there was a large measure of similarity between the services provided by savings banks and commercial banks in Connecticut.

Our own decisions also uphold submarkets in appropriate cases. Thus in L. G. Balfour Co. v. Federal Trade Commission, 442 F.2d 1, 11 (7th Cir. 1971), we

---

tion of what was the appropriate market was rejected by this Court.

**2.** In Part II of the opinion, dealing with the determination of the relevant geographic market, the Justices were split 5 to 4.

rejected an argument that the suppliers of all emblematic jewelry, rather than fraternity products, should be included in the product market, stating that any market definition "which ignores the buyers [here the college newspapers] and focuses on what the sellers do, or theoretically can do, is not meaningful."[3]

Similarly in Avnet, Inc. v. Federal Trade Commission, 511 F.2d 70, at 77–79 (7th Cir. 1975), involving manufacturers of parts which are sold to rebuilders of automotive electrical units, we held that the relevant market should exclude sales of used and rebuilt parts because they were sold 25% to 50% below comparable new items, with no substantial interaction in price between the two lines. We also excluded sales to custom rebuilders because they and production-line rebuilders "perform significantly different functions and operate at significantly different levels of distribution within the overall market * * *" (511 F.2d at 78).

The teaching of these cases leads us to conclude that the district court erred in its perception of the service offered by defendant and thus erroneously determined the relevant market. Concededly, college students are exposed to national advertising in various media, but the critical question is whether the service of representing college newspapers in the placement of national advertising is a line of commerce or submarket within the scope of the antitrust laws. The district court never properly addressed this issue; therefore, we reverse and remand.

## I. THE DISTRICT COURT'S FINDINGS

### A. Description of the Business

Both parties support the district court's description of their business in the opinion below. 374 F.Supp. at 797–798. Briefly, the description is as follows:

"The plaintiff and the defendant are both engaged in the business of representing college newspapers for the placement of national advertising. So far as the evidence indicates, the parties are, in effect, the only serious contenders in this field. The operation of this business can best be viewed as comprised of two aspects.

"At the first stage, the company seeking to establish itself in the business solicits college newspapers to receive authorization to represent them to national advertisers. Because of a lack of staff, financial and other resources with which to solicit national advertisers on their own, most college newspapers which run national advertisements accept the services of a representative.

"Upon acceptance by a newspaper, the second aspect of the representative's operation comes into play—the representative becomes an advertising space salesman for the college papers. * * * [T]he representative solicits national advertisers, either directly or through their agencies, in an attempt to sell them on the college newspaper medium, or, at least the papers it represents, as a viable mode of publicizing their products or services." 374 F.Supp. at 797.

Eventually, the advertiser receives one bill from the representative covering the total amount due the various college newspapers with which its advertising has been placed.

### B. The Parties

As the district court found, in 1970 Cass, whose principal place of business is in Chicago, decided to broaden its then primary business of representing, for local advertising only, various Chicago area college and high school newspapers by becoming a representative of college newspapers throughout the country for the placement of national advertising. Cass claims that of $3,000,000 annual billings for national advertising in college newspapers, Cass received only $50,000 during its fiscal year ending August 31, 1973, allegedly because of NEAS' monopolistic position and practices, includ-

---

**3.** This quotation in the *Balfour* opinion originated in United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 592 (S.D.N.Y.1958).

ing its exclusive agreements with hundreds of college newspapers. 374 F.Supp. at 798.

NEAS has its principal place of business in New York City. Its corporate predecessor was the only business which represented college newspapers in the placement of national advertising for 40 years. In March 1966, the predecessor was purchased by Readers Digest Sales and Service, Inc. and was operated as a division under the NEAS name. The four present individual owners of NEAS purchased it from Readers Digest on December 1, 1970, at a time when its liabilities exceeded its assets. No cash changed hands when the business was transferred from Readers Digest to the present owners, who assumed a portion of the liabilities.

At the time of the hearing below, NEAS had about 894 written contracts with college newspapers designating NEAS as their exclusive representative.[4] NEAS also had about eight non-exclusive written agreements with college newspapers and about 203 non-exclusive oral understandings with them. Its 1973–1974 directory claimed that NEAS represents 1,070 college newspapers with a circulation of 7,163,734, covering "84.3% of the current 8,500,000 college market."[5] The district court found that almost all the college newspapers at the hundred schools with the largest student enrollment, representing about one-third of all college students, have exclusive arrangements with NEAS. 374 F.Supp. at 799.

### C. District Court's View of the Relevant Market

The parties agreed that the geographic market is nationwide. Both presented testimony that college students, who constitute one-third of the 18–24 age group, comprise a distinct market for goods and services. As to the college student group, the court found:

4. These contracts are executed on a form supplied by NEAS and are exclusive only as to other representatives of college newspapers. Thus the contract does not preclude the newspapers from accepting advertising directly from the national advertiser or its agency.

"They have substantially different interests, and, in many cases, live in different environments and have different life styles from their noncollegiate peers. Generally, the students have a broader and more critical range of tastes and will spend more than people their age who are not in school." 374 F.Supp. at 801.

It was also undisputed that college newspapers constitute a distinct communications medium. Apparently a higher percentage of college students read their college newspapers than any other publication with the possible exception of local commercial newspapers, which may reach as many college students. NEAS claims that college newspapers are the most reliable and effective medium to use to reach the college market. 374 F.Supp. at 801.

Having thus recognized the special nature of the individual consumer market that college newspapers effectively reach, the court examined the nature of the service involved in this case and the relevant market for that service. The court's view of the crucial issues in the case can be gleaned from the following passages from its opinion:

"The critical dispute concerns the service or product market. Thus, the question is whether the business of representing college newspapers for the placement of national advertising is a type of service that constitutes a relevant market such that domination thereof makes out a 'part' of commerce within the meaning of the Sherman Act.

\* \* \* \* \* \*

"*This case involves a single service—publicizing a national advertiser's product or service to the college market.* And the evidence indicates that, in this effort, college newspapers are in direct competition with a number of other communication methods.

5. As the district court noted, there is evidence in the record that indicates that the NEAS overestimated the "college market" and that it actually represents newspapers reaching 87% of college students. 374 F.Supp. 799.

"The attitude of national advertisers toward college newspapers vis-a-vis other advertising media was illustrated by the testimony of Mr. Philip Murtaugh, a long-time employee of a national advertising agency." (Emphasis added; 374 F.Supp. at 800–801.)

The court's reason for being concerned with the attitude of national advertisers is made clear in a footnote to the last sentence quoted above, footnote 9:

"9. The attitudes of the national companies on this issue must be examined, for, as the Seventh Circuit has noted, 'any test "which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful."' L. G. Balfour Co. v. F. T. C., supra [442 F.2d] at 11, quoting United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y.1958). At this stage of the analysis, the buyers are the national advertisers; they are purchasing the advertising space offered by the college papers." (Emphasis added; 374 F.Supp. at 801.)

The court noted that although the advertising industry considers college newspapers to be a separate avenue of communication, it also considers them to be in competition with a number of other communication methods in bringing national advertising to college students, such as television, radio, commercial newspapers, magazines, billboards, direct mail advertisements, posters, student directory advertisements and advertising samples. However, the district court did acknowledge, as plaintiff's expert witness had testified, that certain national advertisers' use of college newspapers may be price-inelastic. 374 F.Supp. at 802.

Finally, the district court set forth its definition of the relevant market in the conclusion of its opinion, noting that Cass and NEAS

"are in very real rivalry with other publications and media and their representatives for all or part of the national advertising dollars directed toward the college market.

\* \* \* \* \* \*

"[T]he court has determined that the relevant market must be defined to embrace all modes of competition used to present national advertising to college students. Since no evidence was offered to show defendant's possession of monopoly power in that market, there is no basis upon which the court can reasonably conclude that defendant has violated the antitrust laws." (Footnote omitted; 374 F.Supp. at 803.)

## II. THE DUAL NATURE OF DEFENDANT'S SERVICE AND THE RELEVANT MARKET

In our view, the district court's incorrect definition of the relevant market was an inevitable result of its misunderstanding of the dual nature of the service offered by Cass and NEAS. The district court saw Cass and NEAS as providing "a single service—publicizing a national advertiser's product or service to the college market." The inevitable result of this view of the service is that the national advertiser is the "buyer" or consumer of the service, and the district court so found. Since the court also found that college newspapers, most of which are represented by NEAS, are in competition with other methods of advertising, such as poster boards, television, direct mail, etc., it held that Cass had failed to prove that NEAS had the requisite market power in the relevant market consisting of "all modes of competition used to present national advertising to college students."

Although the district court correctly described the service provided by Cass and NEAS for the college newspapers at the outset of its opinion (see quotation, supra at 1095), it ignored this service in making its relevant market determination. In exchange for a commission, Cass and NEAS offer to represent college newspapers in the solicitation of advertising from national companies. Thus the college newspapers are "buyers" or consumers of Cass' and NEAS' services.

NEAS and Cass are classic "middlemen," providing services to both the sellers (the college newspapers) and to the

buyers (the national advertisers) by representing each seller's wares (an ability to reach a discrete portion of the college market with advertisements) to the buyers. As the district court opinion notes, neither individual buyers nor individual sellers in this market would likely be financially able to seek the other out, absent the services of a middleman. Thus a middleman in this market can have an economically feasible business because it represents numerous sellers to numerous buyers, thereby saving each newspaper and each national company the expense of arranging on a one-to-one basis the placement of advertisements. In contracting with such a representative, a school newspaper arranges for its "wares" to be displayed to a large number of national advertisers without mounting a campaign to contact each of them. Likewise, a national advertiser who buys space through such a representative may pick and choose from a large number of "mini-markets" without the expense of dealing individually with each newspaper that it selects.[6]

As the district court correctly observed, the relevant market may be determined by examining what products or services are reasonably interchangeable, from the purchaser's standpoint, with the product or service in question. See the discussion of *Du Pont* and *Brown Shoe, supra* at 1094. The district court held that national advertisers had significant alternatives to college newspapers for reaching the college market and, therefore, that NEAS was without the requisite market power in the relevant market.

In the context of a "middleman market" such as we have here, however, it may not be easy for a court to choose one of the "end" parties as the sole purchaser of the middleman's services. In this case, the national advertiser is the "ultimate purchaser", that is, it buys page space from the college newspaper. This does not, however, directly control the determination of who is the purchaser of the middleman's services. For example, one can easily imagine a seller or group of sellers who provide a product at a fixed price to ultimate purchasers whether the purchasers are individually motivated to buy or are solicited by a sales representative to whom the seller pays a commission. In such a case, the ultimate purchaser, even though he buys through the solicitor, is clearly not the purchaser of the solicitor's services.

Technically at least, the services of Cass or NEAS are paid for by the college newspapers. The newspaper allows a certain portion of its charge for space to the advertisers to be retained by its sales representative as a commission on the sale.[7] In most middleman market cases, determining who actually pays the middleman will significantly aid the court in determining who is the actual purchaser of the middleman's services.

It is conceivable that both end parties in a middleman market could be purchasers of the middleman's services. In such cases, two relevant market determinations might be necessary. For example, if this case were viewed as a dual purchaser case, the district court's opinion would represent a finding that NEAS has no market power with respect

6. The district court details the reasons that make it efficient for both college newspapers and national advertisers to use a firm like Cass or NEAS. 374 F.Supp. at 797–798.

7. The district court described a typical transaction as follows:

A typical payment process for a $100 advertisement placed through an agency would be as follows: The ad is submitted by the advertiser or its agency to the representative which sends it to the college newspapers designated by the advertiser. Each newspaper runs the ad and returns "tear sheets" to the representative to confirm the printing,

together with a bill. The representative checks the copy to verify that the ad was correct with regard to size, appearance, etc. The advertising agency is then billed $100, and, in turn, bills its client $100. Of the $100 paid to its agency by the advertiser, the agency receives a commission of 15% plus 2% of the balance. Hence, the agency would retain $16.50 [sic] ($15 plus 2% of $85, or $1.70), and would remit the $83.30 balance to the representative. Presently, NEAS and CASS take a 25% commission of this amount, or $20.83, thus, the newspaper receives $62.47. 374 F.Supp. at 797–798, n. 1.

to its national advertiser customers. The question would remain open whether NEAS has market power among the other purchasers of its services, college newspapers seeking national advertising. It would therefore be possible for a middleman to lack the requisite market power in one direction while achieving a complete stranglehold in the other direction.

The esteemed district judge erred by considering the national advertisers as the sole consumers or purchasers of NEAS' services upon whose alternatives the relevant market determination was focused. As the district court found, a college newspaper representative begins its business by acquiring a relationship for representation with college newspapers. Apparently NEAS does not ask national advertisers to sign contracts designating it as their exclusive purchasing representative as to college newspaper advertising. Rather, it seeks to acquire exclusive arrangements with the newspapers as the base from which it operates. Moreover, NEAS is actually paid on commission from the college newspapers for finding advertisers, rather than paid commissions by the advertisers over the offering price of the newspaper space purchased for finding college newspapers. The newspapers, therefore, are the actual purchasers of NEAS' and Cass' services. NEAS and Cass are sales representatives paid commissions by the newspapers for successfully soliciting advertisements from national companies.

Kansas City Star Co. v. United States, 240 F.2d 643 (8th Cir. 1957), certiorari denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438, and Huron Valley Publishing Co. v. Booth Newspapers, Inc., 336 F.Supp. 659 (E.D.Mich.1972), upon which the district court relied, are not applicable to the situation in this case. Both cases involve alleged monopolies of advertising media in a local market. They are therefore not factually analogous to a case like this one, involving the alleged possession of monopoly power in a service market, i. e., the service of sales representative for college newspapers. The district court's reliance thereon was premised upon its view of the customers of the service in this case as the advertisers.

Having redefined the nature of the service in question in this appeal, it remains for this Court to ascertain if Cass adequately proved its definition of the relevant market. By applying the indicia set forth in *Brown Shoe* to the facts of this case, it becomes clear that the relevant market is "the market for representing college newspapers throughout the United States in the placement of national advertising."

One of the *Brown Shoe* indicia for a submarket is whether it has "specialized vendors." This record shows that national advertising representatives specialize by medium. For example, it appears that commercial newspaper representatives do not handle college newspapers and vice versa. As the district court itself noted, each of the parties is "a single, specialized company" in performing its functions for college newspapers (374 F.Supp. at 798).

Another *Brown Shoe* test is whether there are "distinct customers." The customers of these parties are the college newspapers that accept national advertising. The court below understood that such newspapers "constitute a distinct communications medium" (374 F.Supp. at 801). Additionally only national advertisers selling products with a high appeal to the college market will advertise in college newspapers.

Still another *Brown Shoe* submarket criterion is "industry or public recognition of the submarket as a separate economic entity." The court found that Cass' and NEAS' business permits advertisers "to deal with a single, specialized company in placing their advertisements" (374 F.Supp. at 798). They use Cass and NEAS because it is inefficient to deal with each school. Similarly, the college newspapers must rely on these parties to solicit national advertising on their behalf. Indeed, the advertising industry recognizes the representation of college newspapers as a specialized and distinct business.

*Brown Shoe* also adverts to "distinct prices, sensitivity to price changes." There is evidence that in the past, NEAS has raised its commission charge to the college newspapers from 20% to 25%. NEAS told the newspapers that they could raise their prices to offset this rise in its commission without fear of loss of revenue and it appears that this was done. Thus, as the district court noted, the market in the direction of national advertisers may be price-inelastic. 374 F.Supp. at 802. It also may be inferred from this unilateral raise in commission that the purchase price to the newspapers of NEAS' services is price-inelastic as well. As the pricing activity related above may show, since the college newspapers cannot practically assume the solicitation of national advertisers themselves and since other advertising representatives specialize by medium, college newspapers have little alternative to Cass or NEAS if they wish to secure national advertising. Cf. Telex Corp. v. International Business Machines Corp., 510 F.2d 894 at 914–919 (10th Cir. 1975).

The foregoing facts, all reflecting salient *Brown Shoe* criteria, show that the district court erred as a matter of law in not concluding that the service of representing college newspapers in the placement of national advertising was the relevant market.

Cass also contends on appeal that the district court's finding that NEAS lacked market power in the relevant market is not dispositive of its allegations that NEAS' exclusive agreements and alleged anti-competitive activities were independent violations of Section 1 of the Sherman Act. Because the district court on remand will reexamine NEAS' status in light of the relevant market as defined herein, this Court need not decide this issue. It will again be before the district court on remand.

Because of the error in delineating the relevant market, this case must be returned to the district court for further proceedings consistent herewith.[8]

Reversed and remanded.

---

**8.** The district court has already supervised a great deal of discovery between the parties and has heard all the testimony in the case, so that it would delay this litigation to apply Circuit Rule 23. Nor is there evidence of bias that would affect the outcome of this case on remand. Accordingly, Rule 23 shall not apply.