**NATIONAL BUSINESS LISTS, INC., Plaintiff,**

v.

**DUN & BRADSTREET, INC., Defendant.**

**No. 74 C 3516.**

United States District Court,
N.D. Illinois, E.D.

June 11, 1982.

See also, D.C., 552 F.Supp. 89.

Altheimer & Gray, Susan S. Henderson, Benjamin D. Schwartz, Lionel G. Gross, K.R. Gaines, Chicago, Ill., for plaintiff.

Kirkland & Ellis, John H. Morrison, William P. O'Neill, Don H. Reuben, William H. Pratt, Lawrence Gunnels, Thomas F. Ging, Keith C. McDole, Sidney N. Herman, Fred H. Bartlit, Jr., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Following a two and-a-half-month trial, the jury found for defendant Dun & Bradstreet, Inc. (D & B) on the antitrust claims of plaintiff National Business Lists, Inc. (NBL) and for D & B on its copyright and contract counterclaims against NBL. NBL thereafter filed post-trial motions, which were extensively briefed by the parties.

While those memoranda deal initially and at greatest length with the copyright and contract issues, the primary issue at trial was the antitrust claim. It is that claim which will be considered first here. In seeking a retrial of the antitrust claim plaintiff relies on three contentions. The first is that the outcome on that issue, as well as the others, was the result of trial tactics by defendant which the court condoned. The second is that the jury instructions on all claims were overly vague and abstract. The third is that the jury was erroneously instructed (and not instructed) on market concepts.

Before turning to those issues a brief, and therefore oversimplified, description of the thrust of NBL's antitrust claim and of the evidence at trial will be helpful. NBL sells compiled business lists, using information primarily derived from D & B reference books and telephone directories. D & B has for many years sold commercial credit information. With the advent of computers the information obtained for credit reports has been capable of being accessed for business list purposes. D & B, accordingly, began selling compiled business lists to customers desiring mailing lists for mail order sales and other purposes. It thereupon became a competitor of NBL.

NBL, contending that certain of the information accessible only to D & B permitted D & B to market carefully targeted lists, complained that it was at a severe competitive disadvantage as a result. It sought from D & B access to the D & B computer data base in order to use D & B's information to market targeted lists different from those NBL then marketed. D & B was willing to sell its lists through NBL as a broker, on request, but it was unwilling to provide access to its data, and NBL thereafter brought monopoly and attempted monopoly claims. D & B counterclaimed to enforce what it believed to be its copyright and contract rights in the D & B reference books and directories NBL had been using and was continuing to use in compiling its lists.

NBL has not claimed that D & B's acquisition of its information through its credit investigation and reporting functions is in any way violative of the antitrust laws. There was no evidence of any anti-competitive intent in D & B's compiled list marketing introduced at trial, and NBL did not pursue its attempted monopoly claims. It did not claim that in the absence of monopoly power D & B's exclusive access to certain information obtained through its activities in one market obligated D & B to share that information with competitors in a second market if that sharing were necessary to permit effective competition in the second market. It relied instead upon a theory derived from *Berkey Photo, Inc. v. Eastman Kodak Company,* 603 F.2d 263 (2nd Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), and it was upon the basis of that theory, over the vigorous objections of D & B, that the case went to the jury.

The claim was that D & B had monopoly power, lawfully obtained, in a commercial credit services market and that, as a result of monopoly power in that market, it had

monopoly control of information which NBL had to have in order to compete without unreasonable handicap[1] in a second market, which was a compiled business lists market. NBL further claimed that D & B had extended its monopoly power from the first market to the second by engaging in anti-competitive conduct that had unfairly handicapped NBL's ability to compete in that only D & B had the information and D & B had unreasonably refused to make that information available. Because D & B had obtained the information through the use of monopoly power in the first market it had a duty to make that information available to competitors in the second market to the extent necessary for effective competition.

The concept itself is at the outer boundaries of antitrust law, if not, in the circumstances of this case, beyond. *See In re E.I. duPont de Nemours & Co.,* 96 FTC 653 (October 20, 1980) and its extended discussion of monopoly and attempted monopoly cases in the context of lawfully acquired advantages and the court's rejection of pre-disclosure requirements in *Berkey Photo, Inc.,* in light of the economic circumstances there disclosed. The concept ultimately requires a determination of what a trier of fact believes to be misuse of monopoly power rather than appropriate competitive conduct in the particular economic circumstances. That kind of ultimate question is not wholly dissimilar to questions commonly left to a jury, which plaintiff chose to do.[2]

In this case the jury got no further than the question of the first relevant market. By finding, however, that NBL can compete effectively even if it cannot use D & B reference book information plaintiff has used for years, much less the data base here sought, the jury made unmistakably clear its conclusion that NBL had not proved its case.

Plaintiff urges that the antitrust instructions were overly vague and abstract. The short answer is that they were precisely tied to the concepts and factual issues articulated by able counsel in opening statements and closing arguments and to the exhibits and testimony of industry participants and expert witnesses over a lengthy period. This court does not consider instructions to be the occasion for marshalling all the evidence which one party or the other may believe the jury will consider persuasive.

More substantial are plaintiff's contentions respecting relevant markets. NBL argues that internal credit checking cannot be considered as part of a relevant market, that the jury should have been instructed respecting a possible submarket confined to off-the-shelf general purpose reports, and that the submarket criteria in *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), should have been specifically brought to the attention of the jury by the instructions.

At trial the principal focus of the dispute was whether "in-house" credit checking could be considered in defining a relevant market. Plaintiff contended, and contends, that such "in-house" checking is not part of a competitive market and therefore the jury should not have been permitted to consider that alternative in determining market definition.

That approach, however, ignores economic reality. The definition of a relevant market is but one step in the determination of whether a party has monopoly power, the power to control prices or to exclude competition. It matters not whether the issue is elasticity or cross-elasticity of demand if the alternatives are reasonable substitutes which severely restrict the power to control price. There may be only one paperhanger

---

1. NBL preferred "compete without unreasonable handicap" or "disadvantage" and assigns as error the court's use of "compete effectively." That is a distinction without a difference. The concept of effective competition is a commonplace of antitrust law and is at least as capable of common understanding as plaintiff's choices of phrases. Indeed, plaintiff's proposed instructions relied upon the phrase "effective competition" (AT 9, Plaintiff's Response to Dec. 3, 1980 Draft).

2. Defendant sought to strike the jury demand on the basis of complexity. Upon plaintiff's objection that motion was denied.

in town, but if the result of his price increase is that people put up their own wallpaper his "monopoly" is illusory. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1272 fn. 1 (9th Cir. 1975); *United States v. International Telephone and Telegraph Corp.,* 1971 Trade Cases ¶ 73,619 (N.D.Ill.1971); II Areeda and Turner, Antitrust Law ¶ 507.

The submarket concept came up in two guises, and that duality had some impact upon the instructions. There was a suggestion, in two sentences of a pretrial memorandum, of a submarket almost entirely confined to the types of credit reports marketed by D & B. The final pretrial order made no reference to such a claimed relevant submarket, nor did plaintiff's opening statement refer to that alleged submarket. While there was considerable evidence introduced by plaintiff tending to show that D & B, because of the nature of its reports, had a dominant position in providing commercial credit services, it was the court's understanding at the time that the purpose was to evidence monopoly power in the relevant market defined by plaintiff in the pretrial order and opening statement, not in an attempt to show that there was a relevant submarket almost entirely confined to D & B reports. The narrow submarket issue, which was first directly raised near the close of evidence, was one which the jury would obviously not have found persuasive since it did not find the far broader relevant market urged by plaintiff. Nor does the court believe that the concept was timely and supported by persuasive evidence, *see Telex Corporation v. IBM,* 510 F.2d 894 (10th Cir.1975).

The submarket question also arose in the context of whether the jury, if it did not find commercial credit services to be the relevant market, could find it to be a relevant submarket. Plaintiff's reliance upon the *Brown Shoe* criteria was almost entirely in the context of its submarket contentions. This court is aware that the Seventh Circuit has on occasion emphasized a submarket analysis, *e.g., L.G. Balfour Company v. F.T.C.,* 442 F.2d 1 (7th Cir.1971); *Cass Student Advertising, Inc. v. National Educa-*tion *Advertising Service, Inc.,* 516 F.2d 1092 (7th Cir.1975); *Beatrice Foods Co. v. F.T.C.,* 540 F.2d 303 (7th Cir.1976); *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701 (7th Cir.1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), using *Brown Shoe* criteria. Those criteria are, however, merely an analytical tool to "delineate markets which conform to areas of effective competition and to the realities of competitive practice." *Sargent-Welch Scientific Co. v. Ventron Corp., supra,* at 710. Those cases have emphasized the buyers' perspective, the cross-elasticity of demand, rather than cross-elasticity of supply, *see Kaiser Aluminum & Chemical Corp. v. F.T.C.,* 652 F.2d 1324, 1330 (7th Cir.1981), with buyer preferences shaped not only by functional interchangeability but also by perceived differences—what in fact influences buyer action.

■ In retrospect, further instruction related to the *Brown Shoe* criteria and divorced from submarket concepts might have provided additional assistance to the jury in its analysis. The instructions given, however, focused on reasonable substitution from the buyers' perspective and did give adequate guidance to the jury in making the decision it was called upon to make. To ask the jury, as plaintiff urged, to first consider whether commercial credit services was a relevant market and, if the jury determined it was not, to consider on the basis of additional criteria whether it was a relevant submarket, would exalt an analytical tool over the end purpose of defining the area of effective competition and invite jury confusion. The court instructed the jury respecting two relevant market concepts, without reference to submarkets, as in *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), and, in light of the litigation positions of the parties and the evidence, it believes that the instructions were proper.

■ Plaintiff directs much of its fire at what it considers to be unfair trial tactics by the defendant which were condoned by the court. The subject of the extent to

which defendant could bring before the jury matters relating to plaintiff's president and plaintiff's competitive activities was raised at various times during trial. Defendant somewhat overemphasized some matters both in opening and closing arguments. In the closing, plaintiff, apparently for tactical reasons, did not raise any objections at the time and did not ask for any cautionary instructions. In the opening it objected and obtained such an instruction. During the course of the trial the court was faced with the continuing problem of permitting in evidence which defendant legitimately had a right to bring before the jury and limiting the amount of that evidence so it was not given undue prominence. The court is satisfied that an appropriate balance was struck.

While plaintiff's post-trial memoranda would suggest that D & B's defense was largely an underhanded attack on plaintiff, without any justification, that simply was not so. Only a small part of the testimony during the lengthy trial related to matters of which NBL complains. And there were compelling reasons why D & B was entitled to some latitude in introducing that evidence.

█ This was not a price-fixing case in which the liability issue solely focused on the conduct of the defendant. NBL's theory was that it required certain selective information from D & B's data base in order to compete effectively. It was beyond dispute that NBL and D & B are the largest purveyors of compiled business lists. That theory necessarily made relevant NBL's competitive relationship to D & B and within the industry, a subject thoroughly covered in the testimony of plaintiff's witnesses. The purpose of the antitrust laws is to protect competition, not competitors, *Lektro-Vend Corporation v. The Vendo Corporation,* 660 F.2d 255, 268 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Before D & B could be required to pay treble damages and surrender to its principal competitor information which it had lawfully acquired it surely was entitled to explore with those who asserted competitive im-

pact, as distinguished from impact on a competitor, their understanding of what constitutes appropriate competitive activity. The jury was being asked to conclude that the claims of necessity for effective competition arose from a realistic assessment of competitive impact upon NBL and not from the distorted perspective of an overreaching competitor. Much of the evidence of which NBL complains was relevant to that inquiry.

Much of it was also clearly relevant for other purposes. The consortium activities related to claims of infringement and defenses of fair use and estoppel, although the antitrust counterclaim, which was ultimately dismissed, was argued as one basis for admission. With respect to that claim there was no evidence of price-fixing by NBL, even assuming D & B had standing to complain, and defendant made no such argument to the jury in closing argument. Plaintiff itself introduced in the initial testimony the notion that Mr. Gans was one who from humble beginnings had created a small enterprise threatened by a huge corporation. It cannot complain of some rejoinder. Finally, while the court may have shared plaintiff's doubts about the accuracy of a witness' recollection of a conversation with one of plaintiff's counsel, the witness testified under oath and defendant was entitled to bring that version of the conversation to the attention of the jury. *United States v. Segal,* 147 F.Supp. 506 (D.Minn. 1957), *aff'd* 246 F.2d 814 (8th Cir.), *cert. denied,* 355 U.S. 894, 78 S.Ct. 269, 2 L.Ed.2d 192 (1957).

The primary thrust of plaintiff's post-trial motion is against the jury's verdict on the counterclaims. The motion rests on a number of grounds—that the copyright and contract instructions were overly vague and abstract, that they misstated the law and failed to instruct on material issues, that the verdict was a result of unfair trial tactics condoned by the court, that the damages were grossly excessive and punitive, and that NBL was entitled to judgment N.O.V. or a new trial on the copyright and contract claims for a variety of reasons.

Certain of those issues merit serious legal analysis and will be discussed in another

**104**

memorandum. Some, however, may be dealt with summarily. The unfair trial tactics issue has been previously discussed. Obviously plaintiff is exceedingly distressed by the verdict. Ascribing that verdict to the inflamed passions of a runaway jury is, however, this court suggests, an after-the-fact rationalization of an unpleasant reality.

Similarly, the claim that the copyright and contract instructions were overly vague and ambiguous, as distinguished from their substance, is without merit. In view of plaintiff's vehement protestations, this court has reviewed the transcripts of the instruction conferences relating to those instructions, the last occurring immediately before the jury was instructed. The type of instructions given, and to a large extent their wording, was then to the entire satisfaction of plaintiff and, indeed, in various instances the instructions were proposed by plaintiff and given over the objections of defendant. Plaintiff is now apparently suggesting that it was in error and that this court had a duty to disregard plaintiff's suggestions and approval of the type of instructions given. That contention is frivolous.

The motion for a new trial of the antitrust claims is denied.