**CASS STUDENT ADVERTISING, INCORPORATED, Plaintiff,**

v.

**NATIONAL EDUCATIONAL ADVERTISING SERVICE, INCORPORATED, Defendant.**

**No. 73 C 2779.**

United States District Court, N. D. Illinois, E. D.

Jan. 12, 1976.

Jerald P. Esrick, David L. Schiavone, and H. Roderic Heard, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for plaintiff.

John T. Cusack, and Joe A. Sutherland, Gardner, Carton, Douglas, Chilgren & Waud, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

This antitrust action brought by plaintiff CASS Student Advertising, Incorporated ("CASS") against National Educational Advertising Services, Inc. ("NEAS") alleges violations of the Sherman Act. 15 U.S.C. § 1 *et seq.*

Count I alleges that "NEAS unlawfully possesses monopoly power in the relevant market and has unlawfully and wilfully acquired and maintained that power with the intent to monopolize the relevant market and with the intent to exclude CASS or any other competitor from the market" in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

In Count II, NEAS is charged with attempting to monopolize the relevant market in contravention of Section 2.

Count III alleges that the contractual arrangements between NEAS and hundreds of college newspapers, by which NEAS has undertaken to act as exclusive national advertising representative for the papers, constitute agreements in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

The plaintiff seeks various forms of declaratory and injunctive relief and treble damages.

Following extensive discovery and a three-day hearing in December, 1973, this court issued a memorandum opinion on April 15, 1975, reported at 374 F.Supp. 796. On May 23, 1975, the Seventh Circuit rendered an opinion, reported at 516 F.2d 1092, which upheld this court's findings of fact, but reversed on the grounds that this court failed to properly define the relevant market. On November 17, 1975, the United States Supreme Court denied the defendant's petition for a writ of certiorari.

As is described in greater detail in this court's previous opinion, the plaintiff and the defendant are both engaged in the business of representing college newspapers for the placement of national advertising. This service is the performance of the function of a middleman who, for a percentage commission of the advertising revenue generated, undertakes the otherwise expensive and burdensome task of bringing together corporations with nationwide advertising campaigns and the hundreds of college newspapers.

In accordance with the holding of the Seventh Circuit, the relevant market in this business is "the service of representing college newspapers in the placement of national advertising".

The defendant is a New York corporation with its principal place of business in that state. This court found that for approximately forty years, NEAS and its predecessor served as the only business representative of college newspapers for the placement of national advertising. At the time of the hearing, its total annual billings for this service approximated $3,000,000. against $50,000. for the plaintiff. The defendant thus handled substantially all of the national advertising in college newspapers placed through such middleman agencies, and indeed claims to place 95% of all the national advertising placed in college newspapers.

NEAS' dominant position in this market was based upon its written or oral contractual agreements with most of the college newspapers which accept advertising. At the time of the hearing in this case, NEAS had written or oral agreements with 1103 college newspapers including virtually all of the 100 schools with the largest enrollments. As a result NEAS was able to offer advertisers access to approximately 87% of the student population.

Most of these contracts, including those with the largest schools,[1] designated NEAS as the college newspaper's exclusive representative for the securing of national advertising. NEAS had either 893 or 894 identical written contracts providing for exclusive representation. Seven or eight contracts had no provision for exclusive representation, and NEAS also had 202 or 203 non-exclusive oral understandings.

These exclusive representation contracts were of infinite duration, and required 12 months' notice of termination. Under these contracts the colleges remained free to accept advertising directly from a national advertiser or an advertising agency for a national company, but were prohibited from accepting advertising procured by any competing advertising representative such as CASS. These contracts require the newspaper, at the request of Neas, to signify on its rate cards and mastheads that NEAS is its national advertising representative.

■ The extent to which NEAS dominates the relevant market is more than sufficient for a finding that it has monopoly power. *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *American Tobacco Co. v. U. S.,* 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *L. G. Balfour Company v. F. T. C.,* 442 F.2d 1, 12 (7th Cir. 1971); *U. S. v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir. 1945). Certainly the placing of 98% of all national advertising accounts in college newspapers, the sales of 95% of all national advertising in college newspapers, and contractual relationships providing access to 87% of the college student population surpasses the most stringent of requirements for such a finding.

■ Furthermore, this court finds that NEAS has wilfully maintained its monopoly power with the intent to monopolize the market in question. It has sought exclusive representation contracts from college newspapers, and has indicated in letters sent to the newspapers on April 2 and September 27, 1973, that it intends to enforce the exclusivity provisions. Additionally, Joseph Hanson, the president of NEAS, successfully urged the members of the Pacific Coast Publication Managers' Conference at their annual meeting on March 19, 1972, to adopt a resolution pledging collective support for NEAS.

NEAS strongly contends that the accumulation and maintenance of exclusive representative contracts does not constitute a trade practice which is monopolistic, a restraint of trade and violative of the objectives of the antitrust laws. It notes that the Supreme Court has held that exclusive dealing contracts are not *per se* illegal. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Moreover, it correctly notes that exclusive representation contracts are a universally followed practice in the advertising representation business, citing as examples the fields of commercial television and radio, daily newspapers, and certain specialized journals. Indeed, plaintiff CASS utilizes the same exclusivity provisions in at least 21 of its local advertising contracts in Chicago.

■ Regardless of the propriety of exclusive representation contracts in other advertising markets, this court follows the logic of the Seventh Circuit which found that "*in the context of proof of monopoly power,* these contracts [long term, indefinite duration exclusive representation arrangements] are anticompetitive and constitute an unfair method of competition . . . as monopolization*", L. G. Balfour Company v. F. T. C., supra,* at 14. *Tampa Electric, supra,* provides a similar standard in holding that such contracts only violate the law when "performance of the contract will

---

1. The business of the newspapers of the larger universities and colleges is particularly valuable to an advertiser since the line rates do not vary directly with enrollment. Size of school becomes an important consideration of national advertisers in deciding to place ads in college papers since the larger schools offer clearly more economical advertisements.

foreclose competition in a substantial share of the line of commerce affected." 365 U.S. at 327, 81 S.Ct. at 628.

The defendants, in *Tampa Electric* and *Lawlor v. National Screen Service Corporation*, 238 F.2d 59 (3d Cir. 1956), cited by NEAS, prevailed because it was found that their contracts did not substantially foreclose the market to competitors. In contrast, NEAS' exclusivity arrangements, like those in *Balfour*, which they resemble greatly both in terms and scope, effectively tied up access to the bulk of the market, and eliminated competition for much of the business.

The competitive effect of this type of contract is significantly altered in the context of monopoly power. There are 85 advertising representative firms servicing the 700 commercial television stations, 175 firms competing for the business of 6,400 commercial radio stations, and 46 firms seeking to represent the 1,640 daily newspapers. In these advertising markets no individual firm controls more than 6% of the industry trade. With such vigorous competition, each advertising representative must respond to the prices and quality of services offered by its rivals, lest its clients give notice and shift their business. In contrast, college newspapers had no available alternative to NEAS which could offer an equivalent range of national advertising customers.[2]

It is uncontradicted that this market has shown little sensitivity to price changes. There is evidence that NEAS was able to unilaterally increase its commission, confident that "since the college newspapers cannot practically assume the solicitation of national advertisers themselves and since other advertising representatives specialize by medium, college newspapers have little alternative to Cass or NEAS if they wish to secure national advertising." *Cass Student Adv., supra,* 516 F.2d at 1100.

NEAS justifies the exclusive representation agreements with various arguments that they are beneficial to the college newspapers. It asserts that the prospect of several representatives soliciting national advertising for the same college newspapers would create undue confusion among advertisers, significantly complicate bookkeeping for the newspapers, and needlessly duplicate sales efforts in a manner that would transform the business into a "race to the mailbox". It points out that while some college papers have obtained non-exclusive arrangements, the majority seem to be content with exclusive arrangements. Some testimony and many affidavits from the papers indicate that many of the publications prefer exclusive representation, and the members of the PCPMC did endorse that format along with pledging their support to NEAS. Moreover, the plaintiff did fail to present any significant evidence of college newspaper discontent with the existing system.

But even if some of these contentions are plausible, they do not offer any shelter to NEAS from the impact of the antitrust laws. As the Seventh Circuit noted in *Balfour, supra*:

"There are admitted advantages to the fraternities that use the [exclusive representation] contracts. . . . Nonetheless, the accumulation and en-

---

2. The court is, of course, aware that the relevant market for the present case is much smaller and less lucrative than the other advertising representation markets which support many more firms. The total billings in this market were barely over $3,000,000. at the time of the trial. Moreover, it is also aware that after 40 years of operation, the present owners of NEAS were able to obtain it from Readers Digest in December, 1970, for no cash and the assumption of only a portion of its liabilities. It has also been pointed out that the owners of CASS were able to enter this market and continue in business with a total initial investment of $1,000.

Nonetheless, despite these indications that the market in question is neither very large nor exceptionally profitable, and that entry barriers are rather low, the defendant has failed to show the present monopolistic market structure is inevitable and would result even if NEAS refrained from anticompetitive practices.

forcement of [these] contracts does not become lawful because it benefits some fraternities. While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice. *F.T.C. v. Motion Picture Adv. Serv. Co., Inc.,* 334 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953). Congress has embodied in the antitrust laws the theory that the long run advantage of the economic community depends upon the removal of restraints upon competition. *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945); *Standard Oil Co. of California v. United States,* 337 U.S. 293, 309, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949)." 442 F.2d at 15.

Nor does it avail NEAS that some college newspapers have accepted advertising procured by CASS despite the exclusivity provisions. *Balfour, supra,* 442 F.2d at 14.

The evidence before this court and the applicable law lead to the conclusion that the defendant indeed does possess monopoly power in the relevant market of the "service of representing college newspapers in the placement of national advertising", and that it has wilfully maintained that power with the intent to monopolize, and has attempted to monopolize the relevant market, and finally that the provisions of its contracts which establish NEAS as an exclusive national advertising representative constitute unlawful restraints of trade. This court therefore finds that defendant NEAS has in fact violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

In accordance with the above finding, this court hereby orders and decrees the following equitable relief:

(1) All agreements between NEAS and college newspapers providing that NEAS serve as the exclusive agent for the newspaper for the solicitation of national advertising are adjudged and decreed to be unlawful, null and void, in violation of Section 2 of the Sherman Act.

(2) The defendant NEAS, its directors, officers, agents, servants, employees, and persons acting in agreement, concert, combination, conspiracy or participation with them, and each of them, are hereby permanently enjoined and restrained from further enforcement of the agreements described in paragraph (1).

(3) The defendant NEAS is hereby ordered enjoined from any unlawful interference with plaintiff's business dealings with college newspapers or national advertisers and their agencies in the United States.

(4) The defendant NEAS is hereby ordered to affirmatively notify all newspapers with which it has agreements and advertisers and advertising agencies with which it does business that the newspapers' agreements that NEAS be their exclusive agent are null and void, and that they may freely do business with any competitor of NEAS.

The court retains for later determination the question of the award of damages.