### AMERICAN PASSAGE MEDIA CORPORATION, Plaintiff-Appellee,

v.

### CASS COMMUNICATIONS, INC., d/b/a Cass Student Advertising Services, Inc., Defendant-Appellant.

#### No. 84–3688.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1984.

Decided Jan. 11, 1985.

Jerald P. Esrick, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellant.

Before WRIGHT, SNEED, and ALARCON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

American Passage Media Corp. (AP) sued Cass Communications, Inc. (Cass), alleging violations of sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. The district court issued a preliminary injunction, enjoining Cass from enforcing certain exclusive dealing contracts.

The issues on appeal: (1) did the district court apply the proper standard in granting the preliminary injunction; (2) was there sufficient evidence of irreparable injury; and (3) is AP likely to succeed on the merits?

FACTS:

National advertisers use advertising agencies and multi-media means to reach their targeted audience. Approximately 1,300 college newspapers accept national advertising and their representatives serve as middlemen between the advertisers or their agencies and the newspapers.[1]

National Educational Advertising Service, Inc. (NEAS) was the only company representing college newspapers in 1969 when Cass entered the business. NEAS had 1,103 agreements to represent college papers, of which 87% were exclusive. Cass brought an antitrust action against NEAS in 1973. The trial court originally denied injunctive relief. *Cass v. NEAS*, 374 F.Supp. at 803. The Seventh Circuit reversed. *Cass v. NEAS*, 516 F.2d 1092 (7th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). On remand, NEAS was enjoined from enforcing its exclusive dealing contracts. *Cass v. NEAS*, 407 F.Supp. 520 (N.D.Ill.), *aff'd*, 537 F.2d

Richard J. Wallis, Bogle & Gates, Seattle, Wash., for plaintiff-appellee.

1. For a full description of this industry, *see Cass Student Adv., Inc. v. National Ed. Adv. Serv.,* *Inc. (Cass v. NEAS)*, 374 F.Supp. 796, 797–98 (N.D.Ill.1974).

282 (7th Cir.1976). Cass eventually bought out NEAS in a court approved settlement.

Between 1978 and 1980, Cass was alone in the market. College Media Placement Service entered in 1980 and Major College Newspapers, Inc. (MCN) entered in 1981. In April 1982, AP entered the market under an agreement with MCN. MCN ceased operations in late 1982.

Most college papers have nonexclusive agreements with each of the three college representative firms. The cost per line of advertising remains constant for each publication. There is price competition in the varying percent commission each representative deducts from revenues collected from advertisers. The representatives compete also on the basis of the nature and quality of their work.

Most competition for the advertiser's business is on the basis of service. Price competition is limited.

Cass has between 20 and 25 special services agreements with selected college newspapers. These agreements make Cass the papers' sole representative. In return, Cass guarantees prompt payment and charges the lowest commission rate. It also provides confidential information about its sales efforts, membership on a consulting committee, and a half page credit toward an ad in Cass's rate book.

AP challenged the exclusive contracts as illegal restraints of trade in violation of section 1 and as an abuse of monopoly power and an illegal tying arrangement in violation of section 2 of the Sherman Act. AP also alleged that Cass made false and disparaging statements about AP, attempted to hire AP sales employees and engaged in a group refusal to deal with AP.

The district court granted the injunction solely on the basis of a section 2 violation. It found: (1) the relevant market is the market for representing college newspapers in the placement of national advertising, (2) Cass has monopoly power in that market because it places over 80% of the national advertising, (3) the contracts are not per se illegal, and (4) the contracts are being used in an attempt to monopolize in violation of section 2 of the Sherman Act.

*Preliminary Injunction*

The grant of a preliminary injunction is within the discretion of the district court. *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982). We reverse for abuse of discretion or if the decision is premised on an erroneous legal standard or clearly erroneous finding of fact. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir.1984). We reverse also if the court misapplies the law on the underlying issues. *Wilson v. Watt*, 703 F.2d 395, 398 (9th Cir.1983).

The Clayton Act provides injunctive relief under the same principles as generally applied by courts of equity. 15 U.S.C. § 26; *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). Traditional equitable criteria for granting preliminary injunctions include "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Los Angeles Memorial Coliseum*, 634 F.2d at 1200.

█ This circuit has articulated numerous tests by which a moving party can meet its burden. *Regents of the University of California v. ABC, Inc.*, 747 F.2d 511 at 514–15 (1984). Simply stated, the movant must show a combination of either (1) probable success on the merits and irreparable injury or (2) serious questions are raised and the balance of hardships tips sharply in its favor. *Sierra On-Line, Inc.*, 739 F.2d at 1421. These are not separate tests, but rather extremes of a continuum. *Benda v. Grand Lodge of the Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir. 1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

The district court found that AP has a strong likelihood of success on the merits and that the balance of irreparable harm favors AP. Cass argues that the district court erred in (1) finding irreparable injury, (2) applying the underlying antitrust law,

and (3) basing this injunction on clearly erroneous findings that Cass had market power and engaged in anticompetitive conduct and that the exclusive agreements harm the newspapers. We reach only the issue of irreparable injury.

### A. *Irreparable Injury*

■ Regardless of how the test for a preliminary injunction is phrased, the moving party must demonstrate irreparable harm. *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) (*quoting Los Angeles Memorial Coliseum*, 634 F.2d at 1202). Reasonable apprehension of threatened injury will suffice. 15 U.S.C. § 26; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).

■ Review of the trial court's determination of hardships is limited to whether the court considered the proper factors and whether there has been a clear error of judgment. *Sports Form*, 686 F.2d at 752, citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We can think of a myriad of examples of the type of evidence necessary to bolster a finding of irreparable harm under these circumstances. We search the record in vain for that evidence.

■ A sufficient showing of injury to competition could support a finding of irreparable harm. AP alleges it has been harmed because it cannot compete in the market in which Cass has special service agreements. It supported this with affidavits from its own executives delineating the disruptive effect of these contracts on AP's business. These affidavits are conclusory and without sufficient support in facts.

Four advertisers say that they prefer dealing with one company, find it costly and inefficient to deal with college newspapers directly, and that the exclusives will affect their decision to continue to do business with AP. These affidavits are from current clients of AP. None of the advertisers says that it will discontinue business with AP as a result of the contracts. Even if the evidence showed that four advertisers were unwilling to do business with AP because Cass had exclusives with desirable schools, this would be insufficient evidence of irreparable harm. Without a sufficient showing that these contracts threatened AP's existence, any loss in revenue due to an antitrust violation is compensable in damages.

Finally, AP submitted a letter inviting competition for the Peace Corps ad account. AP did not compete because it was specifically required to be able to place ads in all major papers. From this evidence, AP argues that these agreements foreclose competition in a large part of the market.[2] AP's inability to compete for the Peace Corps account, while indicative of injury to competition, is insufficient evidence on which to base a finding of irreparable harm.

We do not see sufficient evidence of foreclosure in this record. Nothing prevents AP from marketing its own more attractive exclusive or non-exclusive package. Neither the advertisers nor the newspapers are prevented from dealing with AP. The contracts are terminable at will, and Cass's market power[3] alone is insufficient to establish the requisite anticompetitive harm.

AP alleges also that it has lost a substantial amount of business due to Cass's use of these special service agreements. The exclusives deny AP any revenue from placing ads in schools with exclusive dealing contracts. Monetary damages are not usually sufficient to establish irreparable

---

**2.** AP quotes Cass's complaint filed against NEAS in 1973, alleging that even one exclusive jeopardizes placing ads in an entire category of papers. These statements are admissible evidence but not conclusive admissions. 4 Wigmore, Evidence § 1066; *cf. Christensen v. Trotter*, 171 F.2d 66, 68 (9th Cir.1948). Nor is the doctrine of judicial estoppel applicable. 4 Wigmore at § 1066.

**3.** The trial court found that Cass had market power because it placed over 80% of the national advertising. Typically, market power is calculated on share of revenues. *See, e.g., Greyhound Computer, Inc. v. International Business Machines Corp.*, 559 F.2d 488, 496–97 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). That is the appropriate measure of power in this market.

harm. *Goldie's Bookstore v. Superior Court,* 739 F.2d 466, 471 (9th Cir.1984). If AP succeeds in establishing an antitrust violation, treble damages will be awarded to compensate for any loss. 15 U.S.C. § 15.

■ The threat of being driven out of business is sufficient to establish irreparable harm. *Los Angeles Memorial Coliseum Comm'n,* 634 F.2d at 1203. AP's president stated that it sustained large losses in 1982–83, and he forecast large losses again in 1983–84. These statements, standing alone, are insufficient evidence that AP is threatened with extinction. *See, Los Angeles Memorial Coliseum,* 634 F.2d at 1201.

**B. *Success on the Merits***

We do not reach the issue of success on the merits except to note that the district court failed to make any findings on specific intent, a necessary element of a section 2 violation.

**CONCLUSION:**

Because our review of a preliminary injunction is limited and because the factual record is not yet fully developed, our action as to the preliminary injunction does not convey any view of the merits of this litigation.

REVERSED.