**DOTSTER, INC., etc., et al.**

v.

**INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, etc.**

**No. CV 03–5045–JFW(MANx).**

United States District Court, C.D. California.

Nov. 12, 2003.

Aaron M. McKown, Kathleen O. Peterson, Preston Gates & Ellis, Irvine, CA, Jeffery W. Ring, Stuart M. Brown, Preston Gates & Ellis, Portland, OR, Benjamin E. Soffer, Perkins Coie, Santa Monica, CA, for Plaintiff.

Emma Killick, Eric P. Enson, Jeffrey A. LeVee, Jones Day, Los Angeles, CA, for Defendant.

## PROCEEDINGS (IN CHAMBERS): ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

WALTER, District Judge.

On September 8, 2003, Plaintiffs Dotster, Inc., Go Daddy Software, Inc., and eNom, Incorporated (collectively, "Plaintiffs") filed a Motion for Preliminary Injunction. On September 15, 2003, Defendant Internet Corporation for Assigned Names and Numbers ("ICANN" or "Defendant") filed its Opposition. On September 22, 2003, Plaintiffs filed a Reply. The Motion came regularly for hearing on October 20, 2003. After hearing oral argument on the Motion, the Court took the matter under submission. After reviewing the moving, opposing, and reply papers and hearing oral argument, the Court rules as follows:

## I. *Facts and Procedural History*

ICANN is a not-for-profit corporation organized in 1998. Pursuant to a series of agreements with the United States Department of Commerce, ICANN is responsible for administering certain aspects of the Internet's domain name system. As part of its responsibilities, ICANN accredits companies known as "registrars" that make Internet domain names available to consumers. Each registrar enters into an identical Registrar Accreditation Agreement ("RAA") with ICANN which permits the registrar the right to use domain names in a particular domain, such as ".com" or ".net." Registrars, in turn, accept requests for domain names from their customers and register those domain names with the appropriate Internet registry.

ICANN also enters into separate Registry Agreements with Internet registries. Each top level domain name—such as .com, .net, or .org—is operated by a single registry. A registry maintains information on each name registered in its domain and insures that each name registered in its domain is unique. Registries offer a variety of services that, for example, permit consumers to check if a particular name within its domain has been registered and, if so, the expiration date for this registration. Verisign, Inc. ("Verisign") is the registry for .com and .net domains and it is responsible for registering names on these domains in accordance with its Registry Agreement with ICANN. Because Verisign is prohibited from accepting requests for domain names directly from consumers, Verisign only accepts and registers domain names received from registrars.

Plaintiffs are three of over 170 registrars, who have entered into identical RAAs with ICANN. Halloran Decl., ¶ 15 & Ex. 2. In exchange for a fee negotiated with their customers, Plaintiffs register

domain names, and all registrant contact information, with the appropriate registry. Plaintiffs also offer a variety of other services, such as web hosting, web page design, e-mail, and internet utilities. Each domain name registration lasts one or two years and consumers are given the option to renew their registration at the end of that term. At present, all domain names that are not renewed, and, therefore, have expired, are first deleted and then become available for a new registration. Currently, there are approximately fifty registrars, including Plaintiffs, who compete in the secondary domain name market which focuses on the registration of deleted domain names. Each of these registrars, including Plaintiffs, have developed their own technology which attempts to identify and register a particular domain name for their customers as soon as it is deleted from the registry. The wait-listing products offered by Plaintiffs permit customers, who want to register a particular domain name that is already registered to someone else, to sign up and pay a fee to the Plaintiffs for the chance to obtain that domain name if it is deleted in the future. Plaintiffs cannot guarantee that they will be able to register a deleted domain name for their customers because several registrars may have sold the chance to obtain the very same deleted domain name to different customers and only one of those registrars will be able to successfully register that name for their customer.

In late 2001, Verisign proposed a new product called Wait List Service ("WLS") which will compete with the wait-listing products offered by Plaintiffs. If customers choose to participate in WLS, a person wishing to register a currently-registered domain name would purchase a subscription for the opportunity to register that domain name in the event the existing domain registration expires within the subscription period. There will be only one subscription accepted for each currently-registered domain name. Each subscription would last for one year with the option to renew. If a domain name is not renewed by its current owner, the individual who purchased a subscription will become the new registrant of the domain name. WLS will only be offered to consumers through registrars, such as Plaintiffs, and Verisign will charge the registrar a fee, which would be no higher than $24 for a one-year subscription, for each domain name. All registrars would have the option to participate in WLS at the same price and there will be no restrictions on the price that the registrars can charge their customers.

Contrary to the current system, domain names that are subject to a WLS subscription would never be deleted from the registry when the original registration expired. If a registered domain name is not renewed, and is to be deleted from the registry, Verisign would check to see whether a subscription exists for the name and, if so, would automatically register the name to the customer. Because Plaintiffs current technology is predicated on the actual deletion of the domain name from the registry, Plaintiffs allege that WLS will deprive them of the opportunity to register a deleted name. The proposed WLS will only impact a portion of Plaintiffs' secondary domain name business because names that were not subject to a WLS subscription and those in TLDs other than .com and .net would continue to be deleted from the registries and would be available for registration by the Plaintiffs. In addition, the proposed WLS will have no affect on how new domain names are initially registered by the Plaintiffs.

Plaintiffs filed their Complaint on July 16, 2003, alleging claims for breach of contract and declaratory relief. Plaintiffs allege that ICANN will be in breach of various provisions of their RAA if it approves an amendment to the registry

agreement between ICANN and Verisign allowing the implementation of WLS. Although Plaintiffs are not parties to the Registry Agreement between ICANN and Verisign, Plaintiffs are seeking a preliminary injunction to prevent ICANN from taking any further steps to facilitate or encourage implementation of WLS by Verisign, including, but not limited to, further steps to negotiate or execute an amendment to the Registry Agreement between ICANN and Verisign which governs the registration of domain names for .com and .net domains.

## II. *Legal Standard*

"A preliminary injunction is appropriate where plaintiffs demonstrate 'either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [their] favor.'" *Southwest Voter Registration Education Project v. Shelley,* 344 F.3d 914, 917 (9th Cir.2003) (*citing Clear Channel Outdoor Inc. v. City of Los Angeles,* 340 F.3d 810, 813 (9th Cir.2003) (*quoting Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 731 (9th Cir.1999))). "The district court must also consider whether the public interest favors issuance of the injunction." *Id.* (*citing Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992)). These are not separate tests, but the opposite ends of a single continuum. *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987) (*citing San Diego Committee Against Registration and the Draft v. Governing Board of Grossmont Union High School Dist.,* 790 F.2d 1471, 1473 n. 3 (9th Cir. 1986)). "Under any formulation of the test, the moving party must demonstrate a significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935 (9th Cir.1987) (*citing Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985)).

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*quoting* 11A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure, § 2948, pp. 129–30 (2d ed.1995)) (emphasis in *Mazurek*). However, a preliminary "injunction is not a preliminary adjudication on the ultimate merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir.1984). "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *see also Sierra On–Line,* 739 F.2d at 1423 (for preliminary relief, the court need only find a probability that necessary facts will be established, not that such facts actually exist).

## III. *Discussion*

### A. *Plaintiffs Have Failed To Demonstrate Irreparable Injury Or That The Balance Of Hardships Tips Sharply In Their Favor.*

Plaintiffs have failed to demonstrate either the possibility of irreparable injury or that the balance of hardships tips sharply in their favor. "Regardless of how the test for a preliminary injunction is phrased, the moving party must demonstrate irreparable harm." *American Passage Media Corporation v. Cass Communications, Inc.,* 750 F.2d 1470, 1473 (9th Cir.1985). Irreparable injury is an injury that is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate. *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995). "Speculative injury does not constitute ir-

reparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Services Company, Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988) (*citing Goldie's Bookstore, Inc. v. Sup. Ct.*, 739 F.2d 466, 472 (9th cir.1984)).

### 1. Plaintiffs Have Failed To Demonstrate Irreparable Injury.

■ The Court finds that Plaintiffs have not demonstrated irreparable injury. Plaintiffs' alleged damages are speculative and any damage incurred can be compensated by money damages. Plaintiffs essentially contend they will be damaged financially because "[c]ustomers will be more likely to use the proposed WLS than" Plaintiffs' wait-listing services to reserve domain names in the secondary domain name market. Declaration of Thomas Bennett ("Bennett Decl."), ¶ 26; *see, also*, Second Declaration of Clint Page ("Page Decl."), ¶ 3; Declaration of Paul Stahura "(Stahura Decl."), ¶ 12; and Declaration of Robert Parsons ("Parsons Decl."), ¶ 8. Plaintiffs also contend they will have to increase their customer service staffs to differentiate themselves from other registrars and to answer an increased number of customer questions about WLS. *See, e.g.*, Parsons Decl., ¶ 9; and Bennett Decl., ¶ 29. Because a monetary award can compensate Plaintiffs for this potential loss of revenue, these injuries do not constitute irreparable injury.[1] *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1202 (9th Cir.1980) (*quoting Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.")); *Cotter v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir.1989) (injuries compensable by money damages are not usually deemed irreparable). In addition, Plaintiffs' argument that their damages are capped at the amount of accreditation fees paid by the Plaintiffs to ICANN pursuant to Subsection 5.7 of the RAA does not change the result. If Plaintiffs entered a disadvantageous contract, they must suffer the consequences. *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3rd Cir.1995) (*citing* 11A Wright, Miller & Kane, *Federal Practice & Procedure*, § 2947 (2d Ed.1995)) ("If the harm complained of is self-inflicted, it does not qualify as Irreparable."); *Ventura County Christian High School v. City of San Buenaventura*, 233 F.Supp.2d 1241, 1253 (C.D.Cal.2002) (*citing Caplan*, 68 F.3d at 839).

Plaintiffs also argue that they will suffer irreparable injury as a result of damage to their goodwill and reputation. However, Plaintiffs present no specific or admissible evidence as to dilution of goodwill or harm to reputation.[2] Although the loss of good-

---

[1] Moreover, Plaintiffs' potential loss of revenue is speculative. Plaintiffs claim that a significant part of their business results from cross-sales of products to customers and if Plaintiffs cannot attract new customers through the secondary domain name market, those cross-selling opportunities will disappear. *See, e.g.*, Stahura Decl., ¶ 13. However, Plaintiffs ignore the fact that all registrars will be able to offer WLS to existing and potential customers. If Plaintiffs decide to offer WLS and continue to offer their wait-listing services for domain names not affected by WLS, Plaintiffs will be able to exploit these cross-selling opportunities.

[2] Plaintiffs offer the inadmissible conclusions of their own executives that if WLS is implemented, Plaintiffs' goodwill and reputation will be damaged due to an anticipated decrease in sales. *See*, Parsons Decl., ¶¶ 6–9 (loss of revenue due to implementation of

will and reputation are important considerations in determining the existence of irreparable injury, there must be credible and admissible evidence that such damage threatens Plaintiffs' businesses with termination.[3] *American Passage Media Corporation v. Cass Communications, Inc.,* 750 F.2d 1470, 1473 (9th Cir.1985) ("Without a sufficient showing that these contracts threatened [plaintiff's] existence, any loss in revenue due to an antitrust violation is compensable in damages"); *Metromedia Broadcasting Corporation v. MGM/UA Entertainment Co., Inc.,* 611 F.Supp. 415, 426 (C.D.Cal.1985) (no irreparable injury where existence not threatened). In this case, there is no evidence indicating that Plaintiffs' businesses will not survive the implementation of WLS or that they will not be able to continue to offer their wait-listing services in the secondary domain name market.

### 2. Plaintiffs Have Failed To Show The Balance Of Hardships Tips Sharply In Their Favor.

The Court finds Plaintiffs have failed to demonstrate that the balance of hardships tips sharply in their favor. The record is devoid of any evidence that the Plaintiffs will suffer irreparable injury if the injunction is denied. By contrast, the issuance of an injunction would seriously jeopardize ICANN's ability to effectively coordinate the technical and related policy issues for the domain name system as mandated by ICANN's agreements with the Department of Commerce.

### B. *Plaintiffs Have Not Demonstrated Either A Likelihood of Success On, Or Serious Questions Going To, The Merits.*

Plaintiffs have failed to demonstrate either a likelihood of success on, or

---

WLS will cause drop in customer service, which will harm Go Daddy's reputation); Page Decl., ¶¶ 3–6 (Dotster's reputation will be harmed by loss of success of NameWinner technology); Stahura Decl., ¶¶ 12–14 (Plaintiff eNom is a "significant competitor" in the secondary domain market and this reputation will be harmed by the implementation of WLS because WLS will cause eNom to have fewer sales with its wait-listing service, Club Drop); and Bennett Decl., ¶¶ 27–30 (Dotster's reputation will be harmed by the loss of success of NameWinner technology). Such conclusory statements cannot support a finding of irreparable injury for the issuance of a preliminary injunction. *American Passage Media Corporation,* 750 F.2d at 1473 (9th Cir.1985) (declarations of plaintiff's executives detailing the disruptive effect of defendant's exclusive contracts on plaintiff's business could not support the issuance of a preliminary injunction because they were "conclusory and without sufficient support in facts."); *Goldie's Bookstore, Inc. v. Sup. Ct.,* 739 F.2d 466, 472 (9th Cir.1984) (reversing issuance of preliminary injunction where district court had determined that plaintiff "would lose goodwill and 'untold' customers" because the finding was not based on any factual allegations and was speculative).

3. Although Plaintiffs' losses, if any, may be reflected in the secondary domain name area of their business, Plaintiffs have not presented any evidence that quantifies or compares those potential losses with other areas of their business. In this regard, Plaintiffs do not even argue that those potential losses would be of such a magnitude that their entire business is threatened with potential ruin. Plaintiffs' failure to present such evidence probably is due to the fact that the wait-listing services represent a relatively new part of their business. For example, Plaintiff Go Daddy Software, Inc. was founded in 1997, but did not start offering its wait-listing service, DomainAlert, until April 2003. Parsons Decl., ¶¶ 3 & 5. There is no evidence that all, or even a significant portion of, Go Daddy Software, Inc.'s goodwill and reputation are based on a service it has only been offering for seven months. *New Pacific Overseas Group (USA) Inc. v. Excal International Development Corp.,* 1999 WL 285493, *6 (S.D.N.Y.1999) (*citing Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 763 (2nd Cir.1979)) (no finding of irreparable injury "where a company has not been in business long enough for good will to be created.").

serious questions going to, the merits of their claims. *Johnson v. California State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir.1995) (*quoting Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir.1984)) (the "irreducible minimum" required under any formulation of the preliminary injunction standard is a "fair chance of success on the merits."). Plaintiffs allege that ICANN will be in breach of various provisions of the RAA if it approves an amendment to the Registry Agreement between ICANN and Verisign, permitting the implementation of WLS without complying with the Consensus Policies requirement of Subsection 4.1 of the RAA.

Subsection 4.1 of the RAA, the only section of the RAA that sets forth any consensus policy requirement, states:

> 4.1 *Registrar's Ongoing Obligation to Comply with New or Revised Specifications and Policies.* During the Term of this Agreement, Registrar *shall comply with* the terms of this Agreement on the schedule set forth in Subsection 4.4, with:
>
>> 4.1.1 new or revised specifications (including forms of agreement to which Registrar is a party) and policies established by ICANN as Consensus Policies in the manner described in Subsection 4.3, . . .
>
> (emphasis added).

The Court finds that Subsection 4.1 only applies in situations where ICANN seeks to compel registrar action without amending the RAA. There is nothing in this provision that imposes any obligation upon ICANN to act only by consensus where its actions do not seek to compel registrar action. Registrars may elect to offer WLS to their customers but they will be under no obligation to do so. Because implementation of WLS will not impose any obligation on the registrars or in any manner amend their RAAs with ICANN, it is unlikely that Plaintiffs will be able to prove that the consensus policy provision of Subsection 4.1 of the RAA is applicable and, therefore, that ICANN breached the RAA by not following that provision.

. Because Subsection 4.1 is the only section of the RAA that sets forth a Consensus Policy requirement, the Court rejects Plaintiffs' argument that Subsection 4.2 [4] imposes an independent obligation on ICANN to develop a consensus policy anytime the allocation of domain names is affected. The Court finds that the plain language of Subsection 4.2 merely enumerates or describes a variety of topics for which ICANN *may* compel registrar action through the adoption of new or revised specifications and policies. However, there is nothing in this provision that creates an independent obligation or requires the implementation of a consensus policy any time domain allocation is affected. [5]

The Court also rejects Plaintiffs' argument that ICANN breached Subsection 2.3 of the RAA. The plain language of Subsection 2.3 makes it clear that the obligations imposed on ICANN under that section do not apply to matters falling outside the RAA. Because the implementation of WLS does not affect a right or obligation of Plaintiffs under the RAA or otherwise re-

---

**4.** 4.2 *Topics for New and Revised Specifications and Policies.* New and revised specifications and policies may be established on the following topics: . . .

4.2.4. principles for allocation of Registered Names (e.g., first-come/first-served, timely renewal, holding period after expiration).

**5.** The Court rejects Plaintiffs suggestion that ICANN is required to obtain registrar consensus before it can enter into any agreement with a third party that might affect domain name allocation. If the Court adopted this interpretation, the registrars would effectively have the power to veto any contract that affected their economic interests.

quire an amendment to the RAA, its implementation falls outside the scope of the RAA. It is unlikely that Plaintiffs will be able to prove that the provisions of Subsection 2.3 are applicable and, therefore, that ICANN breached those provisions of the RAA. Accordingly, even if Plaintiffs could demonstrate the requisite showing of irreparable harm, they have failed to demonstrate either probable success on, or serious questions going to, the merits of their claims and, thus, their request for a preliminary injunction should be denied under any formulation of the standard for issuance of a preliminary injunction.

### C. The Public Interest Does Not Favor Issuance of a Preliminary Injunction.

"In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Fund for Animals v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992) (*citing Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988) *and Northern Alaska Environmental Center v. Hodel,* 803 F.2d 466, 471 (9th Cir.1986)). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Court, in and for County of Carson City,* 303 F.3d 959, 974 (9th Cir.2002). While the effect on the public interest was, at one time, part of the balance of hardships analysis, the Ninth Circuit has held that this factor "is better seen as an element that deserves separate attention in cases where the public interest may be affected." *Id.* at 974. In this case, the proposed preliminary injunction would interfere with the comprehensive scheme devised by the Department of Commerce to administer the Internet. *See, e.g., Bellingrath–Morse Foundation v. Bellsouth Telecommunica-*

*tions, Inc.,* 884 F.Supp. 472, 478–79 (S.D.Ala.1995) (against public interest to interfere with comprehensive system to redesign area code system used throughout United States). Such interference should not be undertaken lightly.

Moreover, as the parties agreed, the public's interest is affected in this case as consumers of Internet domain names. In the current secondary domain market, consumers have no guarantee of acquiring a soon-to-be-deleted registered domain name. Instead, consumers must pay a fee to one or more of the registrars who offer a wait-listing service for the right to compete with approximately fifty other individuals to register the same domain name if that domain name is deleted. However, after WLS goes into effect, consumers will pay one fee to a registrar and they will be guaranteed that they will become the new registrant of the domain name if it is deleted. Additionally, because all registrars will be able to offer WLS, registrars will have to compete against each other in other ways—such as offering additional services, competitive pricing, and/or improved customer service—that will increase the options available to and the value received by consumers. It would appear that because all of the approximately 170 registrars would be able to offer WLS to consumers, as opposed to the approximately 50 that currently offer their own wait-listing services now, the options available to consumers of Internet domain names could greatly increase. Accordingly, it appears that the implementation of WLS has the potential to benefit registries, registrars who do not currently offer wait-listing services, and, most importantly, the public. Therefore, the Court finds that the public interest supports denying Plaintiffs request for a preliminary injunction.

## IV.  *Conclusion*

For all the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

IT IS SO ORDERED.